Kirkpatrick Ch. J.
— These causes have been submitted without argument.
The case stated for the opinion of the Court, places the claim of these two black people, to their freedom, upon two certain deeds of manumission, bearing date on the 16th of June, 1803; the one executed by John Emmons, for the manumission of Dick ; and the other by John Emmons, and Mary his wife, for the manumission of Phebe. These deeds were not executed in [*] the presence of two witnesses, as the act 1798 requires; and for this cause alone, their validity is questioned; and that- question is now submitted to the consideration of this Court.
The defendants seem principally to rest upon the decisions heretofore made, on the acts of 1713-14, and 1769. The act of 1713-14, recites, that it is found by experience, that free negroes are an idle slothful people, and prove' very often chargeable to the place where they are; and, therefore, enacts, that every master manumitting his slave, shall give security to the Queen,' in the sum of 200 pounds, that he will pay yearly to the slave so to be manumitted, the sum of twenty pounds — and that upon refusal so to do, the said manumission shall he void, and of none effect.
The act of 1769, provides, that if any master shall manumit his slave, he shall give bond to the King, in 200 pounds, with condition to indemnify the township against all charges of maintenance, in case the slave so to be manumitted, shall become chargeable; and that on failure thereof, such manumission shaU he utterly void, and of none effect.
Now, upon these acts, it has repeatedly been determined, that a manumission shall be good against the master manumitting, and his representatives, notwithstanding he shall have refused to give the bond prescribed, and notwithstanding the express words therein contained, “that on failure thereof, such manumission shall he utterly void, and of none effect.”
The giving of the bond, &c. being manifestly intended for the benefit of the township, and for that only, the Court so construed the act, as to make this particular intent limit the generality of the words in the last clause; and consequently it was hohlen, that though in all controversies between the township and the master, on the subject of maintenance, the manumission, without such bond, should be void; yet, in all controversies between the person manumitted and the master, [*] it should be valid, and have its full force and effect. The object of the Legislature, was to secure the townships against the expense of maintenance; and this it wras thought was effectually done by this construction of the acts.
*7 But inasmuch as the manlier of manumitting was not prescribed by those acts, and the courts, in favor of liberty, liad gone a great way in supporting manumissions, which were not very precise and determinate; and inasmuch as frequent applications were made for discharges, on the ground of loose conversations, conditional promises, and constructivo bargains, to the no small inconvenience and expense of those who had lawful right; Therefore, the Legislature, in 1798, thought proper to take up the subject anew, and expressly enacted — That every negro, iridian, mulatto or mestee, within this State, who at the time of passing the act, was a slave for his or her life, should continue to be such, unless manumitted and set free in the manner prescribed by law__And in a subsequent section of the same act, this manner is expressly prescribed. It is to be by writing, under hand and seal, executed in the presence of at least two witnesses; and upon such instrument of manumission, being so executed as aforesaid, such slave shall he deemed and adjudged to be free.
When I consider the subject matter before the Legislature, at the passing of this act; when I consider the loose grounds* upon which applications for a discharge were frequently made, and the expense and vexation consequent thereupon ; when I consider that these applications were eagerly supported, and sometimes but too easily listened t(>; when I consider that they had really become a subject of public complaint, at least in one part of the State; and when in this view of the subject, I see the Legislature enact that every slave for life, shall continue to be a slave for life, unless manumitted in tbe manner prescribed by law ; and when I seethe same legislature, immediately after, prescribe that manner, saying that it shall be by writing, under hand [*] seal, executed in the presence of two witnesses at least; Í hold myself bound to say, that the instruments in question cannot prevail. In my opinion, therefore, judgment must he for the defendants.
Rossell, J.
— Both these cases appear to rest on the same ground, viz: two instruments of writing, under the hand and seal of the master, and in one case of the mistress, bearing date June, 1808, declaratory of the intentions of said master and mistress, to set free their slaves Dick and JPhebc. It is contended that these deeds not being executed in the presence of tuvo subscribing witnesses, as the act of ons* Legislature now in force directs, are “ void to all intents and purposes;” and so far as respects the State and the master, or his representatives, this declaration is undoubtedly correct. The act prohibits the manumission of a slave above *8 forty years of age, without security to the township for his maintenance. Yet, may not the master voluntarily relinquish all claim to the personal service of his slave above that age, for a day, a year, or for life? That he might so do, has been frequently decided, under the former laws of this State; and it is now to be considered, whether he may not under the present.
The act of 1713-14, directed the mode by which slaves should be set free. The act of 1769, prescribed a different mode of manumission ; but both of them declared that all attempts to set slaves free, not conformable to the directions therein laid down, should be “utterly void., and of none effect.” The present act, passed in 1798, declares that all persons slaves, at the passing of that law, should continue to be so, unless manumitted in the manner therein prescribed; and the 26th section provides, that “ owners of slaves, not manumitted as before directed, should be bound to support and maintain them.” Taking up then, these three acts, and carefully examining them, J confess, that although our legislators have made use of different modes of expression in their formation, and have, according to the progress of humanity from time to time, made the terms of [*] manumission more safe and easy for the master, and'beneficial to the slave, as far as respects this question, I see no difference in the "construction to be put on them. The same end appears always to bo in view, viz: to prevent the public from being burthened in supporting slaves, whose masters from avarice, or some other motive, were desirous of throwing upon it. To avoid this inconvenience, as well as to aid the humane intentions of those who were willing to liberate any of this unfortunate race, over whom the policy of our country had given a master’s right, appears to have been the principal objects of the several acts of the Legislatures of this State. And if we enquire, what were the consequences arising from a compliance or non-compliance with the different modes prescribed, we shall find them precisely the same in all of them; the first made a slave a free man ; by the latter, he continued a slave. The consequence of a compliance or non-compliance with the directions of the -laws, being the'same in all of them. I repeat my opinion, that the same construction of them, as it respects this question, is fairly allowable. And as it has very frequently been decided by this Court, that proofs of partial freedom, abundantly less than that now before us, (although it did not make a free man, nor release the estate of the master from the maintenance of the slave) were amply sufficient to discharge the slave from all claims of the master, or any under *9 him, to the actual service of him, with whom the contract of partial freedom was made. For the sake of uniformity in our decisions, as well as in the aid of liberty and humanity, (which the law always favors,) I cannot but believe that the instruments in question, completely exonerate the blacks Dick and Phebe, from all claims of personal service.
Pennington, J.
— These causes have been submitted without argument; and are of very considerable importance, as affecting future decisions. The negroes named in the writs of habeas corpus, claim their freedom, upon two certain deeds, purporting to be the deeds of manumission, bearing date the 16th day of June, 1803, executed [*]by their master, John Emmons, in the presence of one witness only. No one of the requisites, required by the act respecting slaves, being complied with, except signing and sealing. By this act, in the first section, it is declared, that every negro, that at the time of passing the act, was a slave during his or her life, should continue such, during his or her life, unless manumitted and set free in the manner prescribed by law. The manner of manumitting, or setting free of slaves, not being prescribed by the common law, we must resort to the statute for instruction on this subject. This is found in the 21st, 22d, and 23d sections of the before recited act. The manner is there prescribed with great precision. Slaves for this purpose, are placed in two classes; first, those between 21 and 40 years of age: second, all other slaves. In the first class, the manumission must be in writing, under hand and seal, executed in the presence of at least two witnesses, or by last will and testament. The slave must be sound in mind, and not under any bodily incapacity of obtaining a support, and not under the age of 21, nor above the age of 40 years. These facts must be certified by the signature of two justices of the peace of the county, and also by the signature of two overseers of the poor of the township where the owner resides; and the certificate must be recorded in the clerk’s office of the county. These requisites being complied with, the act further says, that such slave shall be deemed and adjudged to be free. The second class, comprehending ail other slaves, may be manumitted in writing, under the hand and seal of the owner, in the presence of at least two witnesses, or by last will and testament In this case, the owner, his executors or administrators, or some other sufficient person, with two sureties, being inhabitants and freeholders of the county, at the Court of Common Pleas in the county where the slave resides, the securities to be approved of by the Court, must enter into bond to the State, in 500 dollars, conditioned to. *10 prevent and keep such slave from becoming a charge to the township or county; in which case, the act further declares, [*] that the said, slave shall he free. But for the want of entering into the bond required, the manumission, notwithstanding it contains the other requisites, is declared absolutely void and of no effect. It doth not appear by the case stated, which class the negroes seeking their freedom come within; nor is it very material, not having complied with the requisites of either, except that the instrument of manumission is in writing, and signed and sealed by the party making it, which is required in either case. Thq defects are, that the instrument is not executed in the presence of two witnesses, but only-one; nor was there any certificate obtained or recorded ; .nor bond entered into in compliance with the provisions in the statute. If this case stood alone, simply on the act of 1798, it appears to me, impossible to raise a doubt. I take it for granted, that these negroes were'slaves at the time of passing the act respecting slaves in 1798, otherwise their counsel would not put their freedom on so questionable a ground ; and if they were, the only enquiry under that statute would be, have they been manumitted in the manner prescribed by law, which Í apprehend to be in the manner prescribed by the act of 1798; they certainly have not, in which case, according to the terms of the act, they must continue slaves, and cannot be deemed and adjudged to be free; but their manumission is absolutely void and of no effect.
In opposition to this plain interpretation of the act of 1798, tlie counsel for the State, setup a class of adjudicated cases, in this Court, commencing in the year 1775, and continuing in all likelihood, till the passing of the act of 1798, which cases seem to be bottomed on a distinction supposed to exist between emancipation, as it respects the owner, and emáncipation as it respects the State. That a negro, so far as it respects the master, may be free, but at the same time, quoad the State, he is a slave; and that so far as the subject respected the master, any kind of manumission, verbal, constructive, or even an intention to manumit, if the slave had been beguiled into a dutiful line of conduct by it, was a valid manumission ; but at the same time, so far as the [*] manumission affected the government, it was void. — With great deference to the opinion of those learned and respectable judges, who have countenanced this doctrine, I cannot refrain from observing, that it is a doctrine wholly unintelligible' to me. It appears to me, that slavery is an entire thing; that a man is either a slave or he is not. The State, in the cases decided, did not pretend to claim the ownership of the negroes; if, therefore, they were free from their masters, *11 how could they be slaves? It is a solecism to say, that a man is a slave, and at the same time without a master. If, however, the law stood the same at this time, as it did at the time the decisions spoken of, obtained, I should certainly hesitate before I would consent to over-rule opinions and decisions, that have uniformly been practised on for nearly thirty years in this Court; but I take it, that the act of 1798, places the thing on a different ground. I understand that the acts of 1713-14 and 1769, have been considered as enacted by the Legislature, for the purpose, only, of securing the public from the burthen of supporting and maintaining infirm and decrepit slaves; and to prevent the owners from manumitting their old, decrepit and infirm slaves, and thereby throwing the burthen of their support on the State; and hence the distinction respecting a manumission, extending to the master, and not reaching the State. That a manumission, in any form or shape that could possibly be conceived of, should, in favor of liberty, be binding on the master, and free the slave from his services, but that, at the same time, lie should be considered as a slave, so as to make the master liable for his maintenance and support, in case lie should live to be unable by infirmity or old age, to support himself: — Whether or not this is the true exposition of those acts, I am happy that I am not now called on to determine. Whether it is or not, it is the ground work of the opinions that have been urged by the counsel for the State. But the act of 1798, goes further than the former acts, on the same subject, and directly embraces another object — the prevention of fraud and perjury in the act and proof of manumission, by providing, that if the manumission is not by last will and testament, (the manner of proving which, is already provided for by law,) it shall be under the hand and seal of the owner, in the presence of at least two witnesses. This could not be to secure the public against the maintenance and support of infirm slaves; for that was effectually guarded by the bond with security in one case, and the examination and certificate of the justices and overseers of the poor, in the other.
That the deed of manumission should he executed in the presence of at least two witnesses, appears to me, to be a solemnity introduced by the Legislature, for the purpose of preventing fraud and perjury, and founded on the same reason as the statutes, requiring three witnesses to a will; that conveyance of real estate shall be in writing, and that certain contracts shall be void, unless in writing, and signed by the party to be bound by the same. The operation of these statutes may, in certain cases, bear the semblance of *12 hardship; they may even cause injustice; but no one ever entertained an idea, that a court of law had authority to dispense with the statutes; and at their discretion, say, that in this case they shall have an effect, and in that case not.
We are, however, told in the brief of the learned counsel for the State, that liberty is to be favored. This is a humane and benign principle of our law7, but it can only have operation in doubtful cases; and cannot be set up as a bar to a positive provision in an act of the Legislature. — Dower is also to be favored; but elopement, continuance in adultery and want of reconciliation, creates a forfeiture, that the favor of the Court cannot restore.
We are also told by the counsel for the State, that the claimants of the negroes, are estopped by the act of those under whom they claim, from alledging that the negroes are not free, and that the instrument purporting to be a manumission, binds the present claimants, although it does not the public. If this doctrine were true, the heir at law would be estopped to say any thing against the [*] will of his ancestor, although executed in the presence of two witnesses, or even one; and a devisee, under a defective will, would take the land : and if estoppels extend to matters in pais, as is contended, with truth, by the learned counsel .for the State, the statute for the prevention of frauds and perjuries, would by the operation of this construction of the doctrine of estoppels, be rendered in a great measure nugatory and inoperative. Although a party is estopped to deny his own act solemnly and deliberately done, yet he is not estopped to set up a statute, in his favor, declaring such act void and of no effect.
On the whole, as at present advised, I am of opinion, that the act of Assembly is conclusive on this question, and cannot be got over. If the Legislature did not intend what they have plainly and manifestly enacted, it is very easy to obtain a lawr, declaring their intention; and much better so to do, than that the Court should assume to itself a latitude of construction, incompatible with the plainest principles of law7. If the law is a hard one, be it on those who made it; I had the honor of a seat in the Legislature when it passed, and opposed my feeble abilities to the section on which the defendants ground their defence; but I was not so fortunate as to induce the house, to which I belonged, to think with me. It therefore, became a law, and sitting as a judge, I feel myself bound to give it its full operation and effect.
By the Court.
— Judgment for the defendants.